CULLEN AND DYKMAN LLP
100 Quentin Roosevelt Boulevard
Garden City, New York 11530
(516) 357-3700
C. Nathan Dee, Esq.
Elizabeth M. Aboulafia, Esq.

*Proposed Counsel to Navillus Tile, Inc.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| NAVILLUS TILE, INC., DBA NAVILLUS CONTRACTING | Case No. 17-13162 (SHL) |
| Debtor. | |

-----------------------------------------------------------------x

**REPLY TO LIMITED OBJECTION OF PLAINTIFF BENEFIT FUND TRUSTEES IN *MOORE* V. NAVILLUS TILE, INC. TO MOTION OF THE DEBTOR FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§105(a), 362, 363, AND 364 OF THE BANKRUPTCY CODE (I) AUTHORIZING POST-PETITION SECURED FINANCING; (II) GRANTING SECURITY INTERESTS AND SUPERPRIORITY CLAIMS; (III) AUTHORIZING USE OF CASH COLLATERAL AND (IV) <u>SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(c)</u>**

Navillus Tile, Inc. d/b/a Navillus Contracting, the above-captioned debtor and debtor-in-possession ("Navillus" or the "Debtor"), by and through its proposed attorneys Cullen and Dykman LLP, hereby submits this reply (the "Reply") to the limited objection and reservation of rights (the "Limited Objection" at Dkt. No. 65) filed by four groups of employee benefit funds (the "*Moore* Plaintiffs") to the *Motion of the Debtor for Entry of Interim and Final Orders Pursuant to 11 USC 105(a), 362, 363 and 364 of the Bankruptcy Code (I) Authorizing Post-Petition Secured Financing; (II) Granting Security Interests and Superpriority Claims; (III) Authorizing Use of Cash Collateral; and (IV) Scheduling a Final Hearing Pursuant to*

*Bankruptcy Rule 4001(c)* motion (the "DIP Motion" at Dkt. No. 57)[1] and respectfully states as follows:

## PRELIMINARY STATEMENT

The Court should overrule the Limited Objection because, among other reasons, it represents nothing more than a transparent effort by the *Moore* Plaintiffs – who collectively hold four contingent, disputed, general unsecured claims against Navillus – to continue their bitterly contested litigation against Navillus, which resulted in entry of a judgment that is now subject to an appeal before the Second Circuit, in the Bankruptcy Court. The *Moore* Plaintiffs raise no legitimate objections to the terms of the DIP Facility. Rather, beneath the inflammatory rhetoric littered throughout the Limited Objection is what appears to be a fundamental misunderstanding of the terms of the DIP Facility and an attempt by the *Moore* Plaintiffs to substitute their business judgment for that of Navillus.

In the Limited Objection, the *Moore* Plaintiffs criticize the proposed creation of a "$135 million superpriority lien" and suggest that a "smaller DIP facility . . . on a more modest scale" would have been more appropriate. *See* Limited Objection, ¶¶ 2(A), 2(C). To avoid any confusion regarding the scope of the relief requested in the DIP Motion, Navillus wishes to clarify that: (1) the $135 million represents the *maximum availability* under the DIP Facility, available upon request to Navillus on an as-needed basis; (2) it proposes to grant Liberty a Superpriority Claim only to the extent of losses incurred after the Petition Date under the Bonds or Indemnity Agreements for, among other things, borrowings under the DIP Facility; and (3) it similarly seeks authority to grant Liberty the Post-Petition Lien and Security Interest in Navillus' assets directly related to the Bonded Contracts only to the extent of losses incurred after the

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion.

2

Petition Date under the Bonds or Indemnity Agreements for, among other things, borrowings under the DIP Facility.

As set forth more fully herein, the arguments advanced by the *Moore* Plaintiffs in opposition to the DIP Motion should not be considered by this Court because they are either irrelevant to the issues before the Court or based on a misunderstanding of the relief requested in the DIP Motion.

## **REPLY**

**A.    The DIP Facility Represents the Best Terms Available to Navillus Based on Weeks of Arms' Length Negotiations With Liberty**

1.    The DIP Facility is the keystone of Navillus' strategy to assure project owners, subcontractors, suppliers and other key constituencies that Navillus has the willingness, ability and financial wherewithal to complete all of its approximately sixty eighty (68) construction projects notwithstanding the chapter 11 filing. Prior to the Petition Date, Navillus received default notices on its two largest construction projects – One Vanderbilt and Manhattan West (the "Tishman Projects") – where Tishman serves as construction manager. Thereafter, the *Moore* Plaintiffs began issuing restraining notices against Navillus' bank accounts and other assets. Accordingly, to preserve the value of its business and protect against the precipitous dissipation of its assets, Navillus filed this chapter 11 case.

*Selection of Liberty as the DIP Lender and Arms' Length Negotiation of the DIP Financing Agreement*

2.    Shortly after entry of the Judgment, Navillus and Liberty began engaging in extensive negotiations with Tishman and the owners of the Tishman Projects regarding Navillus' two largest construction projects. As the issuer of over $279 million in Bonds to secure Navillus' performance and payment obligations in connection with the Tishman Projects, Liberty was necessarily involved in these discussions. Given Liberty's potential exposure to losses

3

under its Bonds in the event that a resolution was not reached with respect to Navillus' purported termination from the Tishman Projects, Tishman and the owners of the Tishman Projects requested that Liberty provide Navillus with backstop financing which was ultimately memorialized into the DIP Financing Agreement. Indeed, the DIP Facility forms a critical component of the anticipated global resolution with Tishman and the owners of the Tishman Projects that will enable Navillus to continue to perform work on the Tishman Projects – which represent approximately forty (40%) percent of Navillus' work in progress – and thereby retain its most significant assets for the benefit of the estate.

3.      Navillus and Liberty – each through outside counsel and with continuous input from counsel to Tishman and the owners of the Tishman Projects – spent approximately six weeks engaging in multiple rounds of negotiations regarding the terms of the DIP Facility that were ultimately memorialized in the DIP Financing Agreement. Navillus strongly believes that the DIP Facility, which was the product of weeks of hard fought, good faith and arms' length negotiations, represents the best terms that were available to it.

4.      The *Moore* Plaintiffs make multiple unsubstantiated allegations of fraud on the part of Liberty, accusing it of being a "co-conspirator" with Navillus rather than an "arm's length business associate", which are factually unsupported by the record of the District Court proceedings and inconsistent with the extensive good faith and arms' length negotiations underpinning the DIP Financing Agreement. The *Moore* Plaintiffs also object to any finding that Liberty is not a "responsible person" or "owner or operator" of Navillus given its alleged "active involvement" in Navillus' alleged use of an alter ego and its alleged ability to "micromanage the affairs of Navillus" pursuant to the DIP Financing Agreement. *See* Limited Objection, ¶ 2(H). In fact, the structure of the DIP Facility as set forth in the DIP Financing Agreement is entirely

4

inconsistent with the *Moore* Plaintiffs' "micromanagement" theory given that (i) Liberty has no discretion to deny Navillus' funding requests absent a DIP Financing Default, and (ii) any financial reconciliation of the amounts funded occurs after the funds have been disbursed to Navillus for Permitted Uses.

5. These inflammatory yet very serious allegations raise questions regarding the credibility of the *Moore* Plaintiffs because the decision issued in connection with the Judgment does not contain a single finding of any potential fraud or alleged co-conspirator on the part of Liberty (*see* Limited Objection, Exhibit A, ¶199).[2] Accordingly, Navillus submits that the *Moore* Plaintiffs should be required to either provide actual evidence to substantiate their inflammatory allegations against Liberty or withdraw such allegations on the record.

*Efforts to Obtain Alternative Financing on More Favorable Terms*

6. The *Moore* Plaintiffs admit that Navillus did in fact search for alternative sources of funding from Signature despite the fact that Liberty represented the natural best choice given the interrelatedness of the DIP Facility and the negotiations with Tishman and the owners of the Tishman Projects regarding Navillus' continued performance. However, given that Navillus' most significant assets represent the receivables on its construction projects which are, by operation of law, subject to the rights of Article 3-A claimants as well as any rights that Liberty may have under the Bonds and the Indemnity Agreements, Navillus determined that it was unlikely to obtain more favorable terms from another lender.

7. Navillus submits that it would be hard pressed to find another DIP lender that would offer a $135 million facility at 3% interest (with a maximum default rate of 9%) with

---

[2] Indeed, given the false and defamatory nature of the statements made by the *Moore* Plaintiffs against Liberty in the Limited Objection, Liberty has sent counsel to the *Moore* Plaintiffs a written demand that such statements be immediately withdrawn on the grounds that they violate Bankruptcy Rule 9011.

absolutely *no* commitment fees, letter of credit fees, unused line fees or other fees typically associated with DIP financing, and which gives the DIP lender no discretion to withhold funding absent an event of default. Navillus further submits that it is even less likely to find DIP financing on such favorable terms where the only assets that it can pledge as security are already subject to the prior superior rights of Article 3-A claimants and Liberty under the Bonds and Indemnity Agreements.

8. Accordingly, given the extraordinarily favorable terms of the DIP Facility and the prevailing body of law which sensibly holds that a debtor is not required "to seek credit from every possible lender before concluding that such credit is unavailable", *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.),* 789 F.2d 1085, 1088 (4th Cir. 1986), Navillus submits that it has demonstrated that credit was not reasonably available to it on better terms. *See In re YL West 87th Holdings I, LLC*, 423 B.R. 421, 441 n.44 (Bankr. S.D.N.Y. 2010) (noting that courts require only a showing of "reasonable efforts" to obtain credit otherwise).

### *Use of Proceeds Under the DIP Facility*

9. The *Moore* Plaintiffs argue that allowing Navillus to utilize the funding under the DIP Facility for "such other payments as Navillus may deem necessary or appropriate to maintain its operations . . ." as well as for necessary overhead expenses "does not restrict DIP financing to the so-called permitted uses." *See* Limited Objection, ¶ 2(G). As an initial matter, Navillus does not understand this objection, as the language quoted by the *Moore* Plaintiffs is taken directly from the definition of Permitted Uses in the DIP Financing Agreement. *See* DIP Financing Agreement, pg. 3, ¶ F(iii). Navillus does not presently contemplate using the DIP Facility to fund the payment of executive compensation and believes that its cash flow will support the payment of such expenses, as is set forth in the Budget submitted in connection with

the DIP Motion. Nonetheless, Navillus takes exception to the notion that executive compensation is of "doubtful value" to the estate given the substantial daily contributions of Donal O'Sullivan and other members of senior management to the continued successful operation of the business.[3]

10. The *Moore* Plaintiffs also dramatically assert that Liberty is "prosecutor, judge, and jury" by suggesting that Liberty would somehow direct Navillus to use the DIP Facility to pay any damages Liberty claims to suffer on Navillus' largest project – One Vanderbilt – simply because Navillus will be performing work on such project as a completion contractor to Liberty. Navillus submits that this argument is without merit because the Permitted Uses under the DIP Financing Agreement do not include payment of any damages allegedly incurred on Navillus' Projects, but are rather limited to direct project-related costs and necessary operating and overhead expenses.

**B.    The *Moore* Plaintiffs' Arguments Relating to the Rights of a Creditors' Committee Are Unfounded**

11. The *Moore* Plaintiffs complain of the burden of being cast as the representative of "the entire creditor universe" and attempt to cloak themselves in a creditors' committee-type role, raising concerns about the scope of the Liberty Carve-Out allocable to committee professional fees as well as the pursuit of avoidance actions that would purportedly be a "principal issue in this proceeding." First, it does not appear that the "entire creditor universe" has similar objections to the DIP Motion, as the *Moore* Plaintiffs are the *only* party that filed an objection. Presumably, if other creditors or parties in interest had concerns regarding the DIP

---

[3] Moreover, the *Moore* Plaintiffs state that Mr. O'Sullivan received distributions in excess of $7 million a year in 2015-2016 and annex Navillus' financial statements as exhibits to the Limited Objection. While Navillus finds this to be wholly irrelevant to its request for authority to obtain post-petition financing, it notes for the record that Navillus is a S Corporation that is treated as a pass through entity for taxation purposes. Accordingly, because Mr. O'Sullivan is responsible for the payment of Navillus' taxes, he receives distributions from Navillus for the purpose of funding these tax payments.

7

Facility, those concerns would have been incorporated into an objection or otherwise communicated to Navillus.[4] *See Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) (finding the absence of objections to superpriority financing to represent tacit consent to the imposition of a lien).

12.    In addition, Navillus submits that the portion of the Liberty Carve-Out allocable to Committee Professional Fees is more than adequate given the circumstances of this chapter 11 case where the provisions of Article 3-A of the Lien Law provide much of the creditor body with protections that a committee would normally be seeking to achieve for its constituents.  Finally, the *Moore* Plaintiffs' multiple allusions to the prosecution of avoidance actions in this case – presumably on the part of a committee – is not only premature, but also presupposes that this Court will confer derivative standing on any to-be-formed committee to prosecute any such claims.  It is well-settled that a debtor-in-possession in the first instance has standing to assert avoidance actions on behalf of the estate, and such standing is not conferred on a creditors' committee or any other third party absent court order.  *See In re V. Savino Oil & Heating Co., Inc.*, 91 B.R. 655, 656 (Bankr. E.D.N.Y. 1988) ("Standing to invoke the avoidance powers contained in §§ 544 and 548 rests with the trustee by the express provisions of those statutes" and with a chapter 11 debtor-in-possession pursuant to 11 U.S.C. §1107(a)).

C.    **The Moore Plaintiffs' Other Specious Objections Should be Overruled**

13.    The Moore Plaintiffs also raise several other objections which do not appear to be grounded in law or in fact, but instead simply serve as additional examples of their relentless efforts to use every available opportunity to attempt to continue the District Court litigation in the Bankruptcy Court and elevate their status to something more than the holders of four separate

---

[4] Navillus did in fact engage in discussions with creditors, through counsel, whose comments to the DIP Motion will be incorporated into a revised proposed form of order to be filed with the Court.

8

contingent, disputed, general unsecured claims arising out of the Judgment which is presently on appeal. While Navillus finds these objections to have no bearing on the relief requested in the DIP Motion, it briefly addresses each as follows:

14. The *Moore* Plaintiffs repeatedly conflate ACS and Navillus. Until the pending appeal from the Judgment is resolved on a final basis, Navillus and ACS continue to be (as they always have been) two separate and distinct legal entities. Navillus and ACS are jointly and severally liable on the Judgment which is subject to a pending appeal. Nothing more. The *Moore* Plaintiffs' continued reference to ACS' conduct or facts set forth on the record of ACS' chapter 11 case have no bearing on the matters before the Court and are simply an unnecessary distraction.

15. The *Moore* Plaintiffs express concern that the Superpriority Claim proposed to be granted to Liberty to the extent of borrowings under the DIP Facility may impact "eventual enforcement" of the Judgment, however the *Moore* Plaintiffs will not be enforcing their judgment at any future time. Rather, *if* each of the four union benefit funds that collectively comprise the *Moore* Plaintiffs are ultimately determined to hold allowed general unsecured claims, they will receive treatment on account of their claims under the terms of a chapter 11 plan or as otherwise agreed by the parties. They will not be "enforcing" the Judgment at the conclusion of this chapter 11 case.

16. The *Moore* Plaintiffs question the circumstances surrounding the repayment of the LOC, again based on ACS' conduct relative to its own loan facility with Signature. The LOC with Signature expires by its terms on November 29, 2017 – the date of the hearing on the DIP Motion – with $0.00 due and owing. Navillus last utilized the LOC in December 2015, and those funds were repaid in January 2016. Moreover, a letter of credit that was collateralized by

9

the Signature LOC was released prior to the Petition Date without any additional payment from Navillus. Accordingly, any prior indebtedness to Signature is irrelevant to the instant DIP Motion.

17. Finally, the *Moore* Plaintiffs seek to impose a "special burden" on Navillus to satisfy a heightened scrutiny standard of review notwithstanding well-established Second Circuit law which confirms that Navillus' decision to enter into the DIP Facility is evaluated under a business judgment standard. *See*, *e.g.*, *In re Barbara K. Enters., Inc.*, 2008 WL 2439649 at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (same). This notion is simply unsupported and should not be considered by this Court.

## CONCLUSION

**WHEREFORE**, for the reasons set forth herein and in the DIP Motion, Navillus respectfully requests that the Court (a) overrule the Limited Objection in its entirety; (b) grant the DIP Motion; and (c) grant such other and further relief as the Court deems just and proper.

Dated: Garden City, New York
November 28, 2017

CULLEN AND DYKMAN LLP

By: */s/ C. Nathan Dee*
C. Nathan Dee, Esq.
Elizabeth M. Aboulafia, Esq.
100 Quentin Roosevelt Boulevard
Garden City, New York 11530
(516) 357-3700
*Proposed Counsel to Navillus Tile, Inc.*